Rebecca S. HOLLENBAUGH and Fred K. Philburn, Appellants,

v.

CARNEGIE FREE LIBRARY, OF CONNELLSVILLE, PENNSYLVANIA, et al.

No. 76–1273.

United States Court of Appeals, Third Circuit.

Submitted Oct. 21, 1976.

Decided Nov. 22, 1976.

Mary Warman Terry, Warman & Warman, Uniontown, Pa., for appellants.

Ernest P. DeHaas, III, Coldren & Coldren, Uniontown, Pa., for appellees.

Before ALDISERT and GIBBONS, Circuit Judges, and McGLYNN,* District Judge.

OPINION OF THE COURT

ALDISERT, Circuit Judge.

We are to decide whether the district court erred in summarily denying relief to appellants, two former community library employees who asserted constitutional deprivation when the library trustees terminated their employment. Alleging that the trustees infringed rights secured by the First, Fourth, Ninth, and Fourteenth Amendments, and 42 U.S.C. § 1983, appel-

* Joseph L. McGlynn, Jr., of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

lants brought a civil rights action with jurisdiction based on 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4),[1] seeking declaratory and injunctive relief and monetary damages. The district court found that appellants failed to establish the requisite state involvement to sustain jurisdiction. Accordingly, it entered summary judgment in favor of the defendants without reaching the merits of the complaint. We reverse on the issue of state action.

## I.

In *Magill v. Avonworth Baseball Conference*, 516 F.2d 1328 (3d Cir. 1975), this court analyzed in detail the considerations necessary to determine whether the conduct of a private entity falls within the rubric of state action. We said:

Any discussion of the "protean concept" of state action must begin with the *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). It was there the Supreme Court first enunciated the principle that "[i]ndividual invasion of individual rights is not the subject-matter of the [Fourteenth] amendment"; only "state action of a particular character . . . is prohibited." *Ibid.* at 11, 3 S.Ct. at 21.

Notwithstanding the *Civil Rights Cases*, subsequent decisions of the Supreme Court have pierced the seemingly impenetrable veil of private, individual conduct to find state action. These cases have the capability of being grouped into three general categories: (1) where state courts enforced an agreement affecting private parties; (2) where the state "significantly" involved itself with the private party; and (3) where there was private performance of a government function.

516 F.2d at 1331 (footnotes omitted).

As in *Magill,* we are not concerned here with the first and third categories. These are not circumstances in which state courts have enforced an agreement affecting private parties; nor can it be said that the operation of a library constitutes private performance of a function traditionally associated with sovereignty. Rather, the polestar of our analysis must be whether the state involvement in the challenged action of the library is "significant", *see Reitman v. Mulkey,* 387 U.S. 369, 378, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), that is, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action . . . so that the action of the latter may be fairly treated as that of the State itself," *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), *citing Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), or whether the "State has so far insinuated itself into a position of interdependence with [the library] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961).

A nexus test is necessarily one of degree. As we observed in *Magill,* the Supreme Court has not fashioned "any definitive state action formula"; rather, the Court "admits to extreme difficulty in articulating an all-inclusive test and seems to emphasize that, within the confines of certain guidelines, the presence or absence of state action must be determined on a case-by-case basis." 516 F.2d at 1332 (footnotes

---

1. 28 U.S.C. § 1343. *Civil rights and elective franchise*

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

· · · · ·

· · · · ·

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

omitted). Accordingly, it is "by sifting facts and weighing circumstances", *Burton, supra,* 365 U.S. at 722, 81 S.Ct. at 1332, that we have concluded that the district court erred in finding no state action.

## II.

Appellants' employment was terminated by the Board of Trustees of the Carnegie Free Library of Connellsville on August 9, 1973. The narrative facts concerning government involvement with the library during the relevant time period were fully developed below and appellants make "no contention that summary judgment was precluded by the necessity of further evidentiary development." Appellants' Brief at 1.

For the years 1973 and 1974, the library received approximately 90 per cent of its financial support from local municipalities, school districts, and the Commonwealth of Pennsylvania. In 1973, the library's total income for operating expenditures was $64,402.00; this sum included $41,855.00 from local government sources and $16,793.00 in state aid. Of its total 1974 income of $53,173.16 for operating expenditures, $33,080.00 was received from local government sources, and $15,832.00 in state aid. These monies were used for general purposes of the library, including staff costs, library materials, and other operating expenditures.

Of the 24 authorized members of the Library's Board of Trustees, 15 may be appointed by local governments, with terms concurrent with their terms in office in the appointing local government bodies. On August 9, 1973, when appellants were discharged, 11 members of the Board were

members by virtue of such appointment, including three members of the Connellsville City Council, three members of the Connellsville Area School Board, the South Connellsville Borough Council President, a Connellsville Township supervisor, the Vanderbilt Borough Council President, a Springfield Township supervisor, and a Saltlick Township supervisor.

The Connellsville Area School Board and the Connellsville City Council have, by proper resolutions, agreed that the school district and the city will assist in the maintenance of the Carnegie Free Library in accordance with section 401 of Pennsylvania's Library Code, 24 Purdon Stat.Anno. § 4401. These agreements provide a level of financial support which, together with the support given by other municipalities comprising the school district, ensures that the library will be able to qualify annually for state financial aid.[2] In addition to receiving financial assistance, the library has accepted designation by the Connellsville Area School District and the City of Connellsville "as agent to act for and on behalf of the said School District and of the said City to provide public library service to the residents and taxpayers of the said School District and of the said City."

## III.

In reaching our conclusion that there is sufficient state involvement here to support jurisdiction, we are mindful that "[d]ecisions on the constitutionality of state involvement in private discrimination do not turn on whether the state aid adds up to 51 per cent or adds up to only 49 per cent of the support of the . . . institution."

2. The resolution of the Connellsville City Council provides, in part:
 The City of Connellsville agrees to assist in *the maintenance of the Carnegie Free Library* in accord with the provisions of Section 401 of the Library Code, Act of June 14, 1961, P.L. 324, and at a level of financial support which, together with the financial support given by the Connellsville Area School District and other municipalities which comprise the Connellsville Area School District, will ensure that the Library will be able to qualify

annually for state financial aid in accord with Section 303(1) of The Library Code, but not to exceed an amount equal to one (1) mill of *the total assessed valuation of real estate in* said City. In this connection reference is hereby made to a public election held in or about the year 1901, and subsequent action of the Borough Council of the then Borough of Connellsville, whereby it was authorized that the City levy a tax of one (1) mill for the support of the said Library.

*Norwood v. Harrison,* 413 U.S. 455, 466, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973), *quoting Poindexter v. Louisiana Financial Assistance Comm'n,* 275 F.Supp. 833, 854 (E.D.La.1967), *aff'd mem.* 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968). And we agree with Judge Marvin Frankel in *Grossner v. Trustees of Columbia University,* 287 F.Supp. 535, 547–48 (S.D.N.Y.1968), that "receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government."

But here we believe there was a good deal more. There was massive government financing, in the vicinity of 90 per cent rather than the 49 or 51 per cent discussed in *Poindexter, supra*; and the city had authorized the imposition of a tax for the express purpose of supporting the library. Although concededly not controlling, we believe these are significant factors. Unlike *Magill,* where "[p]laintiff's evidence did not establish that the program was represented as being sponsored by the municipalities," 516 F.2d at 1335, here there was an explicit representation that the library was to act "as agent for and on behalf of" the school district and the city in providing public library service. In addition, a majority of the library's trustees were appointable by governmental bodies. The totality of these circumstances compels our conclusion that state involvement in the library's operation was significant.

Under these circumstances, it is impossible to distinguish the state's involvement in the allegedly discriminatory employment determination from the state's involvement in the general operation of the library. That the state's extensive participation in the comprehensive program may obviate a need to show involvement in the specific activity challenged is illustrated by *Burton, supra,* 365 U.S. at 725, 81 S.Ct. 856, 862, finding that state action existed despite the lack of state participation in the formulation of the segregation policy in issue. In the present case, the state's interdependence with the library establishes it as a "joint participant in the challenged activi-

ty," *ibid.,* in a "symbiotic relationship" with the library, *Jackson, supra,* 419 U.S. at 357, 95 S.Ct. at 457, making it unnecessary to show specific state participation in the challenged action.

We emphasize, in reversing the judgment of the district court, that we do not reach the merits of appellants' complaint. We suggest that, in adjudicating the merits, the district court consider the possible application of *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

The judgment of the district court granting summary judgment in favor of the defendants on the sole ground of the absence of state action will be reversed, and the cause remanded to the district court for further proceedings.