**Anthony M. INDORATO, Plaintiff,**

v.

**Kip PATTON, Defendant.**

**Civil No. 97–2429.**

United States District Court,
E.D. Pennsylvania.

Feb. 2, 1998.

Richard J. Orloski, Orloski & Hinga, Allentown, PA, for Plaintiff.

Anthony M. Indorato, Macungie, PA, pro se.

## MEMORANDUM

CAHN, Chief Judge.

This case presents the question of whether a varsity football player on an athletic scholarship at a state higher educational institution, who attacks and injures a referee during a game, acts under color of state law for purposes of 42 U.S.C.A. § 1983 (West 1994 & Supp.1997). The court finds that the answer is no and dismisses this case, without prejudice, for lack of subject matter jurisdiction.

## I. BACKGROUND[1]

On October 26, 1996, an NCAA Division II football game pitting Cheyney University of Pennsylvania ("Cheyney") against East

---

1. Because Defendant has not responded in this case, *see infra* p. 3, the background information is taken from the complaint, Plaintiff's Brief in Support of Federal Subject Matter Jurisdiction ("Br."), and Plaintiff's unsigned Affidavit in Response to Order of June 4, 1997 ("Aff.").

Stroudsburg University of Pennsylvania was held at East Stroudsburg. (Compl. ¶ 6; Aff. ¶ 2.) Late in the third quarter, during a running play with Cheyney in possession, a foul for "illegal use of the hands" was called on Defendant Kip Patton, Cheyney player number sixty-seven. (Aff. ¶ 3.) Defendant began to approach the umpire who called the foul. (Id.) In the meantime, Plaintiff Anthony M. Indorato, a NCAA-certified football official serving as head linesman at the game, (Id. ¶¶ 1–2), got between the umpire and Defendant and prepared to mark off the appropriate loss of yardage, (Id. ¶ 3). Upon hearing obscenities hurled by Defendant at the umpire, Plaintiff called a second foul against Defendant, this time for "unsportsmanlike conduct." (Id.) Now apparently enraged, Defendant removed his helmet, committing yet another foul, which the back judge called. (Id.) Defendant then struck Plaintiff in the face with his helmet, knocking Plaintiff to the ground and rendering him temporarily unconscious.[2] (Id.)

Plaintiff sustained injuries to his face as a result of Defendant's conduct. These injuries required surgery on three occasions, (Id. ¶ 5), and left a scar near Plaintiff's left ear, (Id. ¶ 8). Plaintiff also was restricted to a liquid diet for approximately four months, which resulted in weight loss of over thirty-five pounds. (Id. ¶ 6.) Plaintiff continues to suffer from, inter alia, partial hearing loss in his left ear, and partial loss of sensation on the left side of his face. (Id. ¶ 9.)

Cheyney punished Defendant for his actions. It appears that within one month of the incident, Cheyney suspended Defendant from the football team, withdrew his financial aid package, and expelled him. (Br. Ex. A; Aff. ¶ 11(J).)

Plaintiff filed this case on April 9, 1997, asserting three causes of action. Claiming that Defendant was a state actor and had "violat[ed] ... Plaintiff's constitutional right to bodily security protected by the Fourth, Fifth, and Fourteenth Amendments to the

United States Constitution," (Compl. ¶ 12(b)), Plaintiff sought recovery pursuant to 42 U.S.C. § 1983. Plaintiff also alleged that Defendant was a state actor and had committed willful misconduct. (Id. ¶¶ 19, 21.) Finally, and evidently arguing in the alternative, Plaintiff alleged that Defendant was not a state actor and had been negligent. (Id. ¶¶ 24–25.) To date, Defendant has not responded in this case.

By order dated June 4, 1997, the court directed Plaintiff's counsel to brief the issue of whether Defendant is a state actor[3] for purposes of his federal claims. Plaintiff filed a Brief in Support of Federal Subject Matter Jurisdiction on July 3, 1997. Attached as Exhibit B to the brief is Plaintiff's unsigned Affidavit in Response to Order of June 4, 1997. Paragraph 11 of the affidavit contains several factual statements that Plaintiff claims will be supported by the record in this case. These statements include Plaintiff's contentions that: (1) Cheyney is a member of the Pennsylvania State Athletic Conference ("PSAC"), which is subsidized by the Commonwealth; (2) Defendant was a member of Cheyney's varsity football team under the supervision of his coach, a paid Cheyney employee; (3) Defendant attended Cheyney on an athletic scholarship, and received liability insurance coverage for participating on the football team; (4) Defendant was chosen to play in, and was depicted in the program for, the Cheyney–East Stroudsburg game on October 26, 1996; (5) spectators paid admission to watch the game, which was held on state-owned realty; and (6) at the time of the incident, Defendant wore a uniform identifying him as a member of the Cheyney football team.

## II. DISCUSSION

### A. Standards for Determining Action "Under Color of State Law" for Purposes of 42 U.S.C. § 1983

■ 42 U.S.C. § 1983 provides in relevant part:

---

2. A cable television company was broadcasting the game, and the entire incident was captured on videotape. (Aff. ¶ 4.) The court did not view the tape.

3. In § 1983 actions, the "under color of state law" inquiry is treated as the same as the "state

action" or "state actor" inquiry under the Fourteenth Amendment. See Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.1995) (citation omitted). Thus, the court uses the terms interchangeably.

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The basic purpose of § 1983 is "to deter *state* actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide related relief." *Richardson v. McKnight,* —— U.S. ——, ——, 117 S.Ct. 2100, 2103, 138 L.Ed.2d 540 (1997) (internal quotation marks and citations omitted) (emphasis in original). Accordingly, to assert a prima facie case under § 1983, a plaintiff must demonstrate a violation of his federal rights by someone acting under color of state law. *See Groman v. Township of Manalapan,* 47 F.3d 628, 633, 638 (3d Cir.1995). To satisfy the "under color of state law" requirement, the plaintiff must show that the defendant "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (internal quotation marks and citation omitted).[4] The sole issue before the court is whether Defendant acted under color of state law when he struck Plaintiff.[5]

The "under color of state law" inquiry is fact-specific. *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725–26, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The Third Circuit Court of Appeals has identified three approaches that the Supreme Court has used in different circumstances to determine whether action is taken under color of state law. *See Mark v. Borough of Hatboro,* 51 F.3d 1137, 1142 (3d Cir.1995). Although there has been debate regarding whether the three approaches are discrete tests, the court of appeals continues to view and apply them as such. *See Groman,* 47 F.3d at 639 n. 17 ("[Supreme Court precedent] appears neither to restrict courts to one specific approach nor to foreclose them from employing various approaches as warranted by the particular circumstances of the cases before them.").

Courts in this circuit commonly refer to the three tests as some variant of: the "symbiotic relationship" or "joint participant" approach; the "nexus" approach; and the "government function" or "public function" approach. *See, e.g., Groman,* 47 F.3d at 639; *Goussis v. Kimball,* 813 F.Supp. 352, 356–57 (E.D.Pa.1993) (identifying two additional tests in a footnote).[6] The symbiotic-relationship approach focuses on the overall relationship between the acting party and the state. *See Community Med. Ctr. v. Emergency Med. Servs.,* 712 F.2d 878, 881 (3d Cir.1983). Under this approach, the court must determine whether "[t]he State has so far insinuated itself into a position of interdependence with [the acting party] that it must be recognized as a joint participant in the challenged activity."[7] *Burton,* 365 U.S. at 725; *see also Reitz v. County of Bucks,* 125 F.3d 139, 148 (3d Cir.1997). In contrast, under the nexus

---

**4.** Although this requirement may seem relatively straightforward, it has been difficult to apply in practice. *See Community Med. Ctr. v. Emergency Med. Servs.,* 712 F.2d 878, n. 4 (3d Cir.1983) ("Commentators and judges have variously characterized the state action doctrine as 'murky waters,' a 'protean concept,' 'obdurate,' and 'a conceptual disaster area.'") (citations omitted).

**5.** Because the court dismisses this case for lack of subject matter jurisdiction, the court does not address Plaintiff's claim that the Commonwealth must defend this action on Defendant's behalf. (*See* Br. at 9–10.)

**6.** Some courts have used other names to describe these tests. The inconsistency is likely attributable to the fact that "the [Supreme] Court uses different phrases to refer to the same or similar theories." *Groman v. Township of Manalapan,* 47 F.3d 628, n. 16 (3d Cir.1995).

**7.** Although it has been suggested that the application of this test is limited to cases involving lessees of public property, *see Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 409, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) (O'Connor, J., dissenting) (citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 358, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)), the test has not been so restricted in this circuit, *see Mark,* 51 F.3d at 1142 n. 6 (citations omitted).

approach, the court focuses on "the specific conduct of which the plaintiff complains." *Community Med. Ctr.*, 712 F.2d at 881. This approach requires the court to determine if "there is a sufficiently close nexus between the State and the challenged action of [the acting party] so that the action of the latter may be fairly treated as that of the State itself." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (internal quotation marks and citation omitted). Finally, the government-function approach asks whether the acting party performs a public function insofar as its activities are "traditionally the *exclusive* prerogative of the State," *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (internal quotation marks and citation omitted) (emphasis in original); *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978),[8] or the state imposes an obligation to perform such a function, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).[9]

### B. Plaintiff's Arguments For Finding State Action

Plaintiff argues that Cheyney is a state actor. (Br. at 1.) In support of this assertion, Plaintiff notes that Cheyney is included in Pa. Stat. Ann. tit. 24, § 20–2002–A(3) (West 1992 & Supp.1997). Plaintiff concludes, without discussion, that Cheyney therefore is a "state-related" institution which is a state actor, *see Krynicky v. University of Pittsburgh*, 742 F.2d 94, 101–03 (3d Cir.1984) (holding that under the symbiotic-relationship approach, actions of University of Pittsburgh ("Pittsburgh") and Temple University ("Temple") constitute state action), as opposed to a "state-aided" institution which is not, *see Imperiale v. Hahnemann Univ.*, 776 F.Supp. 189, 197–199 (E.D.Pa. 1991) (holding that actions of Hahnemann do not constitute state action). Plaintiff then argues that under both the symbiotic-relationship and nexus approaches, individual Cheyney football players are state actors during sanctioned football games. (Br. at 2.)

Plaintiff argues that under *Burton*, a symbiotic relationship exists between Cheyney and Defendant, as evidenced by the factual assertions set forth in paragraph 11 of Plaintiff's affidavit. (*See* Br. at 2–5; *see also supra* p. 4.) Plaintiff also argues that under Pennsylvania law, "football players at state universities are ... state 'employees'" during football games, *Wilson v. Miladin*, 123 Pa.Cmwlth. 405, 553 A.2d 535 (1989), and thus act under color of state law because it is more difficult to meet the statutory definition of "employee" than it is to satisfy § 1983's

---

**8.** In *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the Supreme Court omitted the word "exclusive" in describing this test, and thus appeared to eliminate the "exclusivity" requirement. *See, e.g., McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 528 (3d Cir.1994) (Becker, J., concurring). The Third Circuit Court of Appeals, however, has suggested that it did not. *See Groman*, 47 F.3d at n. 18; *Mark*, 51 F.3d at 1143 n. 7.

**9.** In *Mark*, Judge Greenberg authored both the majority opinion and a separate concurrence. In his concurring opinion, he observed:

I recognize that a number of courts have ... continued to apply the discrete test approach. And because prior precedents of this Court similarly have ruled, I wrote the majority opinion that way.
But I believe that interpretation is wrong.... [A]s the Supreme Court itself has pointed out, it has never been clear whether these different tests are actually different in operation or simply different ways of charac-

terizing the necessarily fact-bound inquiry that confronts the Court in each situation.... [T]he discrete test approach has created nothing short of an analytical muddle. For one thing, the discrete tests collapse into each other and overlap significantly. Moreover, ... Supreme Court cases [regarding state action] have not been the model of consistency[,] and therefore it is unclear when and whether to apply particular tests.... [T]he discrete test approach forced courts into pursuits of the viability of one or another test, rather than into an inquiry of whether under the facts of a particular case, there had been state action....
[C]ourts should consider the principles furthered by the previous tests as part of a single balancing and weighing approach. And it should apply to all cases involving the question of whether a private actor is engaged in state action.
51 F.3d at 1156 (suggesting that the single test should be "whether, all things considered, the otherwise private actor fairly could be deemed to be a state actor") (internal brackets, quotation marks, and citations omitted).

"under color of state law" standard. (Br. at 5–6.) Plaintiff further argues that "state employees who exceed their authority in the scope of their duties are still state actors." (Br. at 7.) Plaintiff lists several alleged similarities between football players and state troopers, arguing that because state troopers are considered state actors, so too should football players. (Br. at 6 & n. 2.) [10] Finally, Plaintiff distinguishes *Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir.1979), (*see* Br. at 3), which suggested that because of changing social mores, colleges no longer act *in loco parentis* for their students. *See Bradshaw*, 612 F.2d at 138–40.[11]

With regard to the nexus approach, Plaintiff argues that the state, through Cheyney, is deeply involved in the supervision of Cheyney football players' conduct on the field, as evidenced by the hiring of a coaching staff and the provision of liability insurance to Defendant. (Br. at 8–9.) Plaintiff claims that this level of involvement meets the nexus requirement. (*Id.*) [12]

## C. State-Actor Analysis With Regard to Cheyney

The court finds that Cheyney is a state actor. In determining whether a college or university is a state actor under 42 U.S.C. § 1983, the presence of an organic statute, without more, is not dispositive. *Cf. Imperiale*, 776 F.Supp. at 197 (holding absence of organic statute not dispositive); *Fischer v. Driscoll*, 546 F.Supp. 861, 864 (E.D.Pa.1982) ("In chartering the colleges within its borders, Pennsylvania is simply exercising its police power to regulate such institutions. Such regulation does not make the conduct of the regulated party state action within the meaning of 42 U.S.C. § 1983."). Although the court in *Krynicky*

discussed in detail the nearly-identical organic statutes at issue there, *see* 742 F.2d at 101–02; Pa. Stat. Ann. tit. 24, §§ 2510–1 to 12 (Temple University–Commonwealth Act), §§ 2510–201 to 211 (University of Pittsburgh–Commonwealth Act) (West 1992 & Supp.1997), the dispositive factor was not the statutes' existence, but rather the comprehensive and affirmative nature of state involvement, in managing the affairs of Pittsburgh and Temple, that the statutes mandate. *See Imperiale*, 776 F.Supp. at 197; *see also Krynicky*, 742 F.2d at 102–03; Temple University–Commonwealth Act; University of Pittsburgh–Commonwealth Act.

The statute cited by Plaintiff, Pa. Stat. Ann. tit. 24, §§ 20–2001–A to 2018–A, although different from those in *Krynicky*, also mandates a level of state involvement sufficient for the court to conclude, in this case, that Cheyney is a state actor. The statute creates a corporate entity known as the State System of Higher Education (the "System"), which is made part of the Commonwealth's system of higher education. *Id.* at §§ 20–2002–A, 20–2003–A. The System, which the statute describes as a "government instrumentality," is comprised of fourteen state universities, which are each named, with the exception of Indiana University of Pennsylvania, the "(Name) University of Pennsylvania of the State System of Higher Education." *Id.* at § 20–2002–A. Cheyney is one of these universities. *Id.* The universities are dubbed "successor institutions to the State Normal Schools," and "appropriations for their operation are ordinary expenses of government." *Id.* In addition, "[s]tate funds appropriated to the system shall be allocated to the individual [universities] on a formula based on, but not limited to, such

---

**10.** Plaintiff's comparison of football players with state troopers is irrelevant. The fact that both football players and state troopers may, *inter alia*, wear uniforms, "function in a quasi-military structure," have "specific job assignments," and follow rules, (Br. at n. 2), is not dispositive on the issue of whether Defendant is a state actor. As the court explains throughout this opinion, what matters is the nature and extent of Defendant's contacts with the state.

**11.** The court need not address Plaintiff's attempt to distinguish this case from *Bradshaw*. Even if *Bradshaw* does not control, the court finds that under the analytic approaches to the state-actor question, the ties between Cheyney and Defendant were insufficient for Plaintiff to hold the state responsible for Defendant's conduct.

**12.** Plaintiff also suggests that Defendant is a state actor because Plaintiff "relied, and was entitled to rely, on Defendant's status as a state actor." (Br. at 9.) This "reliance argument" is irrelevant.

factors as enrollments, degrees granted and programs." *Id.*

The System is governed by a 20–member Board of Governors, comprised of the Governor and the Secretary of Education, or their designees; two state Senators; two state Representatives; six citizens of the Commonwealth; three students from among the universities; and five trustees from among the universities. *Id.* at § 20–2004–A. Some of the duties of the Board of Governors are: (1) "to establish broad fiscal, personnel and educational policies under which the [universities] shall operate"; (2) "to establish general policies for the admission of students [to the universities] and to assure procedural protection for the discipline and expulsion of [the universities'] students"; (3) "to coordinate, review, amend, and approve ... the annual operating budgets of the individual [universities]"; and (4) "to fix the levels of tuition fees." *Id.* at § 20–2006–A.

Each university in the System, including Cheyney, is governed by its own eleven-member council of trustees. *Id.* at § 20–2008–A. The statute requires the Governor to appoint ten of the members of each such council. *Id.* In addition, the Board of Governors appoints a president for each university, *id.* at §§ 20–2006–A, 20–2010–A, who serves as that university's chief executive officer, *id.* at 20–2010–A. Each university's council of trustees and president work with the Board of Governors to, *inter alia*, decide what educational programs to offer, set administrative policies and procedures, and determine how the university's funds should be spent. *Id.* at §§ 20–2009–A to 2010–A.

The System must submit an annual report of its activities to, *inter alia*, the General Assembly, and the report is audited. *Id.* at § 20–2015–A. In addition, each university must submit, to the Governor and the Appropriations and Education Committees of the state Senate and House of Representatives, an annual report of, *inter alia*, its educational program offerings, number of faculty, student credit hours, and degrees conferred. *Id.* at § 20–2017–A.

From the foregoing description of the statute at issue in this case, it is clear that the level of state involvement in managing Cheyney's affairs, as in the case of Pittsburgh and Temple in *Krynicky,* is pervasive. In contrast to the court's findings in *Imperiale* regarding Hahnemann, *see* 776 F.Supp. at 198, Cheyney does not "retain[] the autonomy of a private institution operating in a state-regulated field." Cheyney is not merely a state-aided institution, an institution that receives state funds but whose structure and operations are not subjected to extensive legislative regulation. *See id.* at 197–98 (citation omitted) (distinguishing state-related institutions). The court finds that Cheyney is, in fact, a state-related institution, because as shown above, the state is committed to funding part of Cheyney's operations and plays a central role in virtually all significant areas of Cheyney's general affairs. Accordingly, the symbiotic-relationship test is satisfied, and Cheyney is a state actor within the meaning of 42 U.S.C. § 1983.

## D. State-Actor Analysis With Regard to Defendant

■ The court next considers whether Defendant is a state actor. As the court explains below, taking the facts in Plaintiff's favor, Defendant is not a state actor under any of the three approaches described *supra,* pp. 6–8.

### 1. Symbiotic-Relationship Approach

With respect to the symbiotic-relationship approach, Plaintiff appears to argue that the state, through its relationship with Cheyney, has intermingled with Cheyney football players to such an extent that the state must, by extension, be recognized as a joint participant in Defendant's conduct on the gridiron. This argument fails. Cheyney's relationship with its football players is quite different from the relationship at issue in *Burton.* There, a tax-exempt state agency that owned a tract of public land leased a portion of it to a privately-owned restaurant. *See Burton,* 365 U.S. at 718–19. The agency used the restaurant's lease payments in part to service the agency's outstanding debt obligations, and in turn passed along its tax exempt status, with respect to the land, to the restaurant. *See id.* at 719. Citing this and other "mutual benefits" that flowed from the

lease arrangement, the Court held that the state and the restaurant were interdependent, such that when the restaurant later engaged in racial discrimination, its conduct was state action for purposes of the Fourteenth Amendment. *See id.* at 723–25.

The benefits that, according to Plaintiff, flow from Cheyney's relationship with Defendant and other Cheyney football players, fall short of establishing such a symbiotic relationship. Although Defendant received a scholarship, liability insurance, and a uniform free-of-charge, and although Cheyney, the PSAC, and even the NCAA may have imposed certain requirements on Defendant in connection with his varsity status, "[t]he symbiotic relationship test requires that the plaintiff allege significant state involvement with [the acting party] beyond state funding and regulation." *Imperiale,* 776 F.Supp. at 197. The fact that the Cheyney–East Stroudsburg game program and Defendant's uniform identified Defendant as being associated with Cheyney does not show significant state involvement.

■ Plaintiff's reliance on *Wilson* is misplaced. In *Wilson,* the Commonwealth Court held that even though "a high school football player is not a school district's 'employee' as that term is defined under standard usage," the defendant, a public high school football player who allegedly injured a spectator during a game, nevertheless was the district's employee under a "much broader" definition of the term found in 42 Pa. Cons.Stat. § 8501 (1997). *See* 553 A.2d at 536–7. The Commonwealth Court's findings have no binding effect on this court, however, because "a state court construction of a state statute has no bearing on whether an entity that is connected with the state is a 'state actor' for purposes of the fourteenth amendment and § 1983." *Krynicky,* 742 F.2d at 103 n. 12.

## 2. Nexus Approach

Plaintiff's argument under the nexus approach also fails. Although Plaintiff alleges some involvement by the state in Cheyney's football program, Plaintiff has not established that playing football at Cheyney is, at its core, anything more than a student activity. The hiring of a coaching staff and the provision of liability insurance, even when considered along with the other factual assertions contained in Plaintiff's affidavit, do not show the close connection, between the state and Defendant's actions on the football field, required for the court to treat Defendant's conduct as that of the state. As the court of appeals stated in *Groman,* "[a] private action is not converted into one under color of state law merely by some tenuous connection to state action." 47 F.3d at 638.

## 3. Government-Function Approach

Finally, although Plaintiff's brief does not discuss the government-function approach, the court finds that Defendant is not a state actor under this approach. The challenged activity in this case is vastly different from, for example, the provision of fire protection, which is a government function. *See Mark,* 51 F.3d at 1145. As the court suggested above, playing college football is in essence a student activity. The establishment or maintenance of a college football program is neither traditionally nor exclusively the prerogative of the state, and the state imposes no duty to establish or maintain such a program. Thus Defendant furthered no state objective and performed no public function when he played football for Cheyney.

## III. CONCLUSION

For the reasons described above, the court finds that this case involves the allegedly tortious conduct of a private individual, not a state actor.[13] The court's holding is limited to the facts of this case. Here, Plaintiff has not met the "under color of state law" requirement for actions filed pursuant to 42

**13.** Although the court has followed each of the three approaches in determining that Defendant is not a state actor, the court notes that even under the single test suggested by Judge Greenberg, *see supra* note 9, and taking into account the Supreme Court's directive to "avoid[] impos-

ing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed," *see Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the outcome would be the same.

U.S.C. § 1983. Accordingly, the court dismisses this case, without prejudice, for lack of subject matter jurisdiction. Plaintiff may seek redress for Defendant's allegedly tortious conduct in the courts of this Commonwealth.

An appropriate order follows.

### ORDER

AND NOW, this 2 day of February, 1998, upon consideration of Plaintiff's Brief in Support of Federal Subject Matter Jurisdiction, and for the reasons expressed in the court's memorandum, it is hereby ORDERED that the case is DISMISSED, WITHOUT PREJUDICE, for lack of subject matter jurisdiction. The Clerk is directed to close the docket for statistical purposes.